Thank you, Your Honor. In this case, I'm representing Don Florem. This is a similar case, same ALJ, same doctors, same lawyers, same town, a lot of similarities in this case. I hope I can keep it. Right. Same step four analysis. Same step four analysis. And the ALJ's opinion looked somewhat similar. When you read one, it's like reading the other. A little bit of the same set of algorithms, it's very similar realization to this case. Anyway, it's very similar outcome. Okay. Your Honor, I would recommend this case. Lastly, judge if you want to bring it up before we go, Adam, please. Adam Healy Judge, any questions? Judge, any questions? Carried. We have time for questions. Supposedly you don't have long questions. That would be all right.   whether they were published to the extract from 1685, whatever those were not in my excerpt of record and I didn't know if they were in yours or not. So just in case I brought an extra copy in case it happened at the printer and on all of them were the same as mine. So I apologize for that. And those are the last pages of the Algeria's decision. So I remember reading. I thought I read the entire decision. And it's very similar. It's an identical findings that that Miss Florum had often had deficiencies of the concentration, persistence or pace resulting in failure to complete tasks in a timely manner. In this case, in addition to that, there were also findings from the DDS physicians who the judge said, quote, these are experts in the disability evaluation process and I accept their opinions full heartedly. Was that that expert page two or four? Dr. Brown, same doctor who had in the last case said claimant would not work well with the public, giving her anxiety and disorganization. And so the judge says, well, she can go back and work with her cashier job. The very nature of cashier jobs to work with the public. If you're not making change or taking change from the public, you have nothing to do. I mean, that's the cashier job. That's what it is. And so he accepts Dr. Brown's findings. Yet he also doesn't really take us through an analysis of what a cashier must do. But I think by common sense, we know that what a cashier has to deal with the public. That's that's all she does is deal with the public eight hours a day. Miss Florum never did work at this job full time. She's she's always struggled with her mental impairments. And as a result, and also physical impairment, she's got some severe physical impairments. That is one thing that's different on this case than on the previous cases that she has some sufficient significant severe heart impairments. And her board certified cardiologist was Dr. Foley from Yakima. And she he stated at one eighty five that she is at risk of sudden death with her underlying cardiac problem. She's fainted on many occasions. In fact, at work, she fainted on three different occasions. And she said that resulted in a problem with her manager. Obviously, it would. He's going to be worried about liability, all sorts of things with her fainting at work three different times. And she said that's one of the reasons her hours were cut. And if we look at her earnings record, she averaged 15 hours of work per week. Her first year, she worked there 12 hours the next week and nine hours per week the next year. And then finally the job ended as a cashier job. And she she indicated that the reason why was in part because of the problems she had with the manager because of her missing work, because of illness. Her condition also deteriorated over time. She'd actually gone in to seek treatment while she was working as a cashier job and try to get control of this situation, because she had had some extreme traumatic childhood incidents of sexual, physical and emotionally being abused since a very young age. When she was four, she saw her six year old brother murdered. Her stepfather, who she had abused her, he would torment her and killed her pets in front of her. So she was having flashbacks and she was and she was diagnosed with post-traumatic stress disorder. She said these flashbacks would be brought on by such things as fragrances, which you would have to deal with as a cashier on a daily basis. You can't control the people that come in or the perfumes that they wear. She had the record shows there was about this time that she quit working. There was three serious arguments in her family that brought back the flashbacks, the anxiety, the fears of death, impending doom, because of all the trauma that she had. And this was the post-traumatic part of it. It brought it back. And so there's no question in this case what the findings were. I mean, the ALJ said they were off. And he said that. That's his own opinion. Can you explain to me your argument here about the substantial gainful activity for work and her earnings and how that all works? Yes. Your Honor, the Social Security rulings require that in order for past work to be considered, and this is a term of art, past relevant work, because it's defined by the regulations. It says that the work has to be recent enough, which it was. It was within the last 15 years. It says it has to be performed at the substantial gainful activity to be considered past relevant work. Our argument about the cashier job is that Judge Dethoff should not even consider this past relevant work, because it was not performed at substantial gainful activity levels. At the time that she did the work, the regulations say that there's a presumption that it's SGA if the earnings are over $500 per month. If they're under $300, there's a presumption it's not SGA. If they're between $300 and $500, then the ALJ must make specific findings of why it is or isn't SGA, which Judge Dethoff- This is one of those cases that falls in the middle. Yeah. The last year, she was below the $300. The first two years, she was over $300 but under $400. So she was always closer to the $300 level. And so it is- So what is the ALJ required to do in that instance? The ALJ is required to make specific findings and to go through an analysis that we put through in our brief, which says such things as to consider the number of hours worked, to consider the benefit to the employer, compare it against what other people are doing in that type of a situation. There's a whole analysis that he's got to do under the regulations, which he did none of that. What he did, he put in his boilerplate, he put a string side of 11 cases where other courts had found that ALJs had made those findings and, therefore, they had overcome the burden that they had to do. But he didn't make those findings. He just said, well, other judges have made those findings and other courts have said when they made the findings that it was SGA. But he didn't bother to go through that analysis. Is he actually required to make the – to consider those factors? Yes. He's required under the regulation to. Well, I believe. Maybe that's right that he didn't make those findings. The question really is, is that – we'll call it the shortcut method sufficient, right? Yeah. In other words, can we imply from his spring citation that he considered the issues and, in effect, he says, well, I'm making the same findings in this case as in the cases cited, right? Yeah. The problem with that is it's a factual – it's factual findings you have to make based on the facts of the case. So they're all factually different. But your argument basically is that – is that his – the ALJ's analytical approach was deficient. Yes. Contained legal error. Because, in fact, there was none. There was none. If we agree with you, it seems like what we would have to do is just send it back and ask him to – I think on that issue that would be correct. To make the required findings. Yes. On that issue, I would agree. To apply the appropriate analytical approach. Remand for additional proceedings. I would agree. But on the other issue of often having deficiencies of persistence and pace, I think you could reverse for payment of benefits because Mr. William Wright's statement is in this file also. And each court that has addressed that issue has paid for benefits when there has been vocational expert testimony in that specific case. It was – the other thing I thought was kind of interesting was the judge at the very beginning of the transcript where we started, I gave him Exhibit AD, which is Mr. Wright's statement. And he says, I understand you want to make a statement about this, Mr. Wright's statement. I says, yes, Your Honor, I think it is relevant. I understand, as you can gather, that before the hearing even started off the record he said he considered it irrelevant. And I explained to him why it was relevant. Because the DDS had found that she often had these deficiencies. And this is a hypothetical that Mr. Wright addresses. He's got 13 years of experience. It's relevant to this case because it says she can't work. And that's the issue. And he says, well, this is a non-adversarial proceeding, so I will allow you to enter it as an exhibit. But I consider it irrelevant and give it no weight. And that was his immediate response to the whole line of thing. I think he didn't properly evaluate it. He didn't even look at it. It was obvious from the beginning of the hearing, even before the hearing had concluded, he had already made up his mind. Even before the hearing started, he had already made up his mind. Any other questions? Good morning. Lisa Wolf for the Social Security Administration. I would first note that the due process argument just submitted is akin to the substantial gainful activity argument, which was submitted in a reply brief. And we briefed that issue. The issue was not ---- Well, it was raised in the ---- I guess your point is that it was raised in the district court in ---- A reply brief. A reply brief. And did the district court have oral arguments? This is the Eastern District of Washington case, so it was handled by the Department of Justice. I believe Mr. Tree made a ---- Well, do you know from looking at the district court file and record, was there an oral argument on the motions for summary judge? Actually, I only know by reading Judge Succoe's decision. He referenced oral argument in this matter. So do you think they might have discussed it at oral argument? Actually, I'll ---- Mr. Tree? I don't know. Whether or not there was oral argument, did the district court consider that an issue? In Judge Succoe's ---- I don't have his ruling here. I believe he addressed the substantial gainful activity. It's presumptive under our regulatory statutes to fall for two of the years between the $300 and $500 limits. This is a case that deals with the Offman category under the psychiatric review technique form. I call that a PURDIF form, Your Honor. PURDIF form? You have all these acronyms down. It's a very difficult word. It is a form used for a very ---- it's a blunt instrument. It's used as ---- we operate under a five-step sequential evaluation. We use the PURDIF form as steps two and three. It's a blunt, it's a broad instrument. There are four different categories. In this category, the ALJ found that Ms. Florham had ---- often had deficiencies in concentration, persistence or pace. And those are in the disjunctive. And that's significant because often it's very vague. There's three different categories. It could mean she has ---- often has deficiencies in concentration or persistence or pace. And then what the ALJ is required to do is to make a specific residual functional capacity assessment, which we call an RFC. And that's a very precise finding. It's ---- where the PURDIF is attached to the decision, it's used for a ---- for the first two steps. The residual functional capacity is much more precise. And I will note ---- Roberts, Jr. Let me ask you this. Shouldn't the residual functional capacity at least account for that assessment? Kagan Absolutely. And it did in this case, Your Honor. At page 36, finding five of the evidence of record ---- Roberts, Jr. Let me just ---- page 36 of the excerpts of record? Kagan Excerpts of record, yes. Roberts, Jr. Okay. Kagan In this case, the ALJ made a very precise residual functional capacity. Roberts, Jr. Page 36. So this is one of those numbered findings. Kagan Yes, it is. It's number five. Roberts, Jr. Okay. She is slow to adopt? Kagan Well, first, simple repetitive tasks. Roberts, Jr. First what? Kagan The first finding was that she's limited to simple repetitive tasks and that she ---- those are tasks that are not detailed nor complex. Roberts, Jr. How does that relate to concentration? Kagan Well, concentration, the functional limitations, those are ---- Roberts, Jr. I can do repetitive tasks, but, you know, at least when you lose your concentration, you might not be able to. Kagan Right. What we're talking about in that particular situation are end results of deficiencies of concentration or persistence or pace, much like what the Court in Thomas discussed, the end results, functional limitations. And the ALJ also fashioned in a residual functional capacity, excuse me, that as Your and she has difficulty acquiring and retaining new information. Well, in this instance, Ms. Floren performed the work as a cashier for three years. Now, she testified ---- this is a case that involves ---- Roberts, Jr. How long before her onset of ---- Kagan Shortly before. Roberts, Jr. Her claimed onset of disability. Kagan I believe her alleged onset of disability was September 97 when she left work. Now, she reported to various physicians that she left work because of child care difficulties and difficulty with the manager and because she had been ill. So she left work not entirely because of perceived disability. So this is a credibility issue. It's not been challenged. The ALJ and Judge Succo found Ms. Floren not to be entirely credible. So this is a step four past relevant work case. Can you point to anything in the decision, the analysis, part of the ALJ's decision that discusses the deficiencies? You mean Ms. Floren's deficiencies, concentration, persistence or pace? Yes. In the analysis when he talks about past relevant work. Well, Your Honor, in this case, unlike the previous case, he cited to the Department of, I want to say transportation, but the DOT number, the Dictionary of Occupational Titles. On page 33 of the excerpts of record, he noted, and under Thomas, the DOT is an excellent source for vocational information on jobs. So in this case, the ALJ considered the Dictionary of Occupational Title at page 33. And he also discussed. The DOT, though, describes jobs as they generally might appear in the economy. Right. And in this case, the ALJ discussed how she actually could perform the job. He found that she had done the job. She would not need to acquire new skills, and that she could do this job, and that she left the job for reasons other than disability. So, yes, Your Honor, there was discussion. So in this case, the ALJ made the appropriate findings that she could perform her past relevant work as a cashier as actually performed and as performed generally under the DOT. What's your response to Judge Tashima's question to your opposition counsel here about the presumptive earnings with respect to her substantial gainful activity? Well, they are presumptive. And on page 31 and 33 of the excerpts of record, the ALJ discusses. And it's just not string sites. There's analysis in there. He discussed. Well, you know, I will also reference that there's a credibility issue as to why she only had a few hours. But moving on, on page 31 or 33. What he said was while there was part-time work, it was substantial gainful work. Part-time work can constitute substantial gainful activity. And he cites maybe it looks like a dozen cases. Right. And that's the underlined passage I was just looking for as well. So he noted her three years of experience. She knows the job. She did it well. Notwithstanding that one of the examining physicians noted that she might have difficulty with the public. She actually performed this work well and left for other reasons other than her. Let me ask you, when doing that presumptive range between 200 and between, was it 300 and 500? Yes. Does the ALJ under the guidelines or regulations or manual policy statements of the Social Security Administration have to address the factors that are identified? Well, she, in this, just because the income does not meet the, falls in the presumptive range, does not mean that she's not capable of substantial gainful activity. I understand that. Right. Right. Exactly. So it falls in the presumptive category. So the ALJ, in this case, mentioned, he referenced that it was part-time. And because there was testimony that she worked, what, three to four hours when she could get them, she testified as to that. And then he found that that was, he did not make an explicit finding, but the record provides, you know, it flows. The inference flows that this was substantial gainful activity. Because of her performance of it for many years and her ability to do so. Okay. Any other questions? No. Thank you very much. Thank you. Did I have 25 seconds left? Yeah. I just wanted to make sure that I, because I didn't address this previously on the. Go ahead and use up every second. Thank you. On the issue of waiver, because in our brief, in the district court brief in chief at page 14, we did argue that she barely was able to work 25 hours a week, that normally it was less than that, that she'd have problems with the numbers of hours of work, and that she she should be found disabled because of her inability to work full time. At page 11 of the defendant's brief in chief, they pointed out that past relevant work must constitute substantial gainful activity. The very issue they said they waived. And they argued that in their brief and the chief. And then we in detail in the reply brief argued it. And both sides argued it at oral argument before the magistrate judge. And the government did not ask for waiver at that time. Thank you.  Thank you. Thank both counsel. This case is submitted for decision.
judges: Reavley , Tashima, Paez